## LA DOW v. NORTH AMERICAN TRUST CO. et al.

(Circuit Court, D. Oregon. December 28, 1901.)

1. GUARDIAN AND WARD—ILLEGAL SALE—NOTICE—RECORD—PRINCIPAL AND AGENT.

While plaintiff was a minor, owning the undivided one-half of certain land, his mother, who was his guardian, his brother (owning the other half), and another, conspired to raise money by mortgaging such land. The guardian petitioned to sell plaintiff's property, and a few days thereafter she, with the brother and third party, joined in a mortgage of such land. Nearly two months thereafter a pretended guardian's sale of plaintiff's interest was made to such third party, subsequently confirmed, and a guardian's deed to him made. He paid no consideration, and subsequently he, with plaintiff's mother and brother, without consideration, conveyed to another, who conveyed to defendant's son, who was her attorney in fact, and assumed a part of the mortgage, and afterwards conveyed to her. The evidence was indefinite as to what, if any, consideration was paid by defendant's son, and also conflicting as to whether he was fully informed as to the nature of the transactions and of plaintiff's rights. The mortgage was subsequently adjudged invalid by the supreme court of the state. Held, that defendant's son and grantor was charged with notice that the pretended purchaser at the guardian's sale had joined in the mortgage before the sale, and that there was no necessity for both the mortgage and sale to meet the minor's requirements, as shown by the petition for the sale, and that

by his assumption of the mortgage he became a party to the illegal transaction.

**2. SAME—PRINCIPAL AND AGENT—KNOWLEDGE OF AGENT.**

Defendant, being the grantee of her attorney in fact, is bound with notice of all he knew relating to the fraudulent character of the guardian's sale, and of plaintiff's right, and hence such sale and subsequent conveyance should be set aside.

On Rehearing.

**1. GUARDIAN'S SALE—MORTGAGE PRIOR TO PURCHASE—INFERENCE OF FRAUD —RECORD—NOTICE.**

Where a pretended purchaser at a guardian's sale, pursuant to a scheme to raise money on the property, executes a mortgage thereon before the sale,—it being understood that he will reconvey the property to the ward, but, instead, conveys to another,—the transaction is so unusual that a subsequent grantee cannot rely on the record as rebutting the inference of fraud arising from the mortgage being so executed.

**2. SAME—FRAUD—ABANDONMENT OF PART OF SCHEME.**

Where a pretended purchaser at a guardian's sale, pursuant to a scheme to raise money on the property, executes a mortgage thereon before the sale, agreeing to reconvey, the fact that, instead of so reconveying, he conveys to another person, does not purge the sale of its fraudulent character.

**3. SAME—EVIDENCE—NOTICE.**

Evidence leaves no room to doubt that a subsequent grantee claiming title through a fraudulent guardian's sale had full notice of the character of the sale, and of the existing rights of the ward in the property.

John J. Balleray and Carter & Raley, for complainant.
Raleigh Stott, for defendant Letitia Lombard.
Geo. W. Hazen, for defendant North American Trust Co.

BELLINGER, District Judge. Certain property, including that in dispute, belonged to Geo. A. La Dow in his lifetime. La Dow died about May 1, 1873, intestate, leaving a widow and two children, Frank La Dow and the plaintiff, Lewis McArthur La Dow, then about 4 months of age. Thereafter, and on September 12, 1889, the widow, Mattie La Dow, as guardian of Lewis, who was then in his seventeenth year, petitioned the county court for an order authorizing the sale of certain property, including that in dispute. The petition alleged the minority of Lewis, stating his age to be 14 years or thereabout; and it alleged facts showing the necessity for such sale, which was authorized by the county court. Thereafter, and on November 14, 1889, the property of said minor, consisting of the undivided half of lots 3 to 10, inclusive, in block 8 in the town of Pendleton, was sold to one Charles B. Isaacs for the sum of $15,-000, which sale was afterwards, and on January 8, 1890, confirmed by the county court. On the 11th of the same month the widow, as guardian, executed her deed for the property sold to Isaacs. Prior to this sale, and on September 27, 1889, Mattie A. La Dow (the widow and guardian), Frank La Dow, and Isaacs executed a mortgage to the Conklin Trust Company upon said lots 3 to 10, inclusive, in said block 8, for $17,350. This mortgage was dated September 1, 1889. On March 13, 1894, the same parties (Mattie A. La Dow, Frank La Dow, and Isaacs) conveyed the mortgaged property to one James A. Howard for the consideration stated in

the deed, of $40,000. On the 21st of January, 1895, Howard and wife conveyed an undivided half interest in lots 5, 6, 7, and 8 in said block 8, including the premises in dispute, to B. M. Lombard, for the expressed consideration of $17,500. This sale was subject to one-half of the Conklin mortgage. Thereafter B. M. Lombard conveyed the interest so acquired to Letitia Lombard, defendant herein. Howard and Letitia Lombard divided the property so held in common; the latter taking the west 27 feet of lots 7 and 8, the premises in dispute, and assuming $1,500 of the Conklin mortgage. It is conceded, or at least not disputed, that the guardian's sale was an expedient to secure a loan upon the property by means of a mortgage executed by the purchaser, who did not pay any consideration for the guardian's deed to him. Neither did Howard pay anything for the property. His interest in what was done grew out of an understanding by which he was to have some interest in the property for services in collecting rents, paying taxes, and interest on the mortgage. Both Isaacs and Howard understood that a mortgage on the property was the thing to be effected by the guardian's sale. The purchaser at the sale was to mortgage the property, and then reconvey to the parties in interest. Instead of doing this, the property was conveyed to Howard to manage; and thereafter a portion of it was conveyed to Lombard, in the expectation that Lewis McArthur La Dow's equity could be satisfied by the transfer to him of certain "back lots." At least, this is the effect of Howard's testimony. Howard testifies that he thinks he talked to Lombard before the latter's purchase about his understanding that the guardian's sale was a step towards mortgaging the property, and that Lombard said the record of the property was all right. B. M. Lombard denies explicitly any conversation with Howard such as is detailed, and he denies any knowledge of the so-called equities of young La Dow, and states that his knowledge of the title was derived from his examination of the record. He knew of the Conklin mortgage, and assumed one-half of it. He is charged, therefore, with notice that Isaacs, through whom he claimed, had joined in the mortgage before he became a purchaser at the guardian's sale. It was apparent that there was no necessity for both a mortgage and a sale. The necessity for money to meet the minor's requirements, as shown by the petition upon which the order of sale was made, was met by the loan which the mortgage secured. This fact, and the fact that Isaacs' mortgage anticipated his title, tend to show that the sale was a mere device to effect the mortgage. Lombard assumed a part of the mortgage debt. To the extent of the minor's interest, an illegal claim was, in effect, paid by him out of the minor's property. He thus voluntarily became a party to the mortgage transaction, by which a lien forbidden by law was attempted to be fastened on complainant's property. The mortgage has since been adjudged invalid by the supreme court of the state; and the defendant Lombard, in the briefs filed in her behalf, seems to assume that the obligation to pay a part of the mortgage debt, which was a consideration in the purchase relied upon, has been discharged by the adjudication, so that she is, upon the contention made in her behalf,

benefited by the illegal mortgage at complainant's expense, since it must be presumed that the consideration in the purchase was diminished by the amount of the illegal lien assumed by the purchaser. The defendant Lombard is the mother of B. M. Lombard, and was represented by the latter as her attorney in fact, and she knew all that her attorney knew. The parties to the transaction in question may have intended nothing wrong, in point of morals. They did, however, attempt a legal wrong, in attempting to accomplish by indirection a thing which the law does not permit. Moreover, what was done does not appear to have been of advantage to the interest affected. Lombard testifies that he paid $1,000 and conveyed some 50 or 60 suburban town lots in consideration of the purchase in question. Howard hesitates to say that anything was paid. To the direct question as to whether Lombard paid any money, Howard says:

"Well, that is a hard question to answer. In one way he did. In another way he did not."

And when requested to explain, he says:

"Well, Judge, I would have to detail a trade here that would take m᷍ a half a day to explain it. * * * We made so many settlements and trades back and forth, that it would be hard to say whether he paid anything of value or not, and, if he did, how much."

Howard finally admits, however, that he thinks he got $1,000. He received 50 or 60 suburban lots, which he mortgaged for $500 through Lombard, and whether he gave them all up for the mortgage, or got a small equity out of them, he cannot state. Howard further testifies that there was $660 in the bank in his name, which had been deposited under the contract with the mortgage company; that one-half of this sum was turned over to Lombard to pay interest on the Conklin mortgage and insurance on the La Dow Block.

I am convinced that the interests of the complainant were not advanced, but were prejudiced, by the mortgage-sale transaction, and that there are no equities in favor of Lombard or his grantor in the premises, and it is against equity that Lombard should be permitted to profit at the expense of complainant by reason of the illegal mortgage which the sale was intended to effect.

The complainant is entitled to the relief prayed for, and it is decreed accordingly.

On Rehearing.

(January 29, 1902.)

J. J. Balleray and Charles Carter, for plaintiff.
George Stout and Pipes & Tifft, for defendants.

BELLINGER, District Judge. The facts in this case are stated in the opinion heretofore rendered on the final hearing. The petition for rehearing argues the legal questions involved in the case, about which there is no controversy, at some length. As to the fact that Isaacs executed the mortgage to the minor's property before the guardian's sale at which he pretended to get title, and that Lombard assumed a part of the mortgage in the purchase of the

minor's interest, it is argued that no other inference can be drawn than that Isaacs meant to procure title, and may have had an understanding or agreement with the guardian that he would bid for the property at the guardian's sale when it should occur, and that, if such inference should be held sufficient to put Lombard on inquiry, the inquiry, if followed, would only lead to the record. It is claimed that the record was examined by Lombard, and rebutted whatever inference of fraud there may have been arising from the mortgage, and that this was as far as Lombard was required to go, and that there was no other source of information to which he could go; that the existence of a device to mortgage the property through the means of a sale was rebutted by the fact that Isaacs did not deed the property back after the mortgage, as he had agreed to do; that the conveyance by Isaacs to a third person was an abandonment of the device in question; and that the possession of Howard, Isaacs' grantee, points away from the fraud to bona fides in the transaction. The petition then discusses the inferences drawn by the court from the facts stated, and argues from the testimony that Lombard bought the property in question in good faith and for a valuable consideration. It may be that the record facts in the case are not sufficient to charge Lombard with notice of a scheme to circumvent the law and incumber the minor's property; but if, as seems to be conceded, these facts might warrant an inference that Isaacs meant to procure title, and perhaps that he had an agreement with the guardian that he would bid the property in at the guardian's sale, then the unusual circumstances so inferred were suggestive, at least, of the truth in the premises. It is needless to say that there can be no such assurances of title at a future guardian's sale as will authorize a mortgage in advance of the sale. It is quite true that a grantor's covenant of warranty will operate to convey an after-acquired title, but it is not true that the practice obtains of mortgaging or selling land that the grantor does not claim to own. Such a transaction would be unusual, and, if it has occurred in a case that admitted of some binding agreement for a title in advance, I doubt if it has ever been heard of where the title was to come through a judicial sale. Concede, then, that there was enough to suggest to Lombard that Isaacs mortgaged the plaintiff's property under an agreement with the guardian that the property was to be sold at guardian's sale, and that he (Isaacs) should become the purchaser; does this lead to nothing, or, as is argued in the petition, does it lead away from the truth? If it does not conclusively prove, at least does it not warrant the inference of, concerted action between Isaacs and the guardian to effect a mortgage by the means of a sale? The argument that if there was such a device the failure of Isaacs to deed the property back, as he had agreed to do, and his conveyance to another, was an abandonment of the device, assumes that what would otherwise be a fraudulent expedient is made proper and lawful by the bad faith of one of the parties to the transaction; that Isaacs, having gone into a scheme to effect an illegal mortgage by a guardian's sale upon an agreement to reconvey, could purge the sale of its fraudulent character by keeping the property, instead of keeping his word to restore it. If it is not

113 F.—2

conceded, it is conclusively proven, that the sale in question was a mere device to effect a mortgage; that Isaacs paid nothing for the property, and was to reconvey it, the mortgage scheme being consummated. Isaacs testifies that he purchased the property in question at the guardian's sale at the request of complainant's uncle and mother, the latter being his guardian; that the guardian's sale was a mere form; that he did not purchase the property, but went through the form of a purchase, "just for the purpose of putting that mortgage on it"; that it was understood beforehand that he was not to pay anything, and that he did not pay anything,—"never paid a cent"; that he was to turn the property back to the complainant after the mortgage was made, and he does not remember just how it was fixed up. Isaacs, as a matter of fact, joined Mrs. La Dow in a conveyance to Howard, from whom B. M. Lombard acquired it. Howard does not appear to have paid anything for the property. His relation to it seems to have been that of a mere agent or trustee, to manage the property, and pay for it out of the proceeds of a sale when he should make one. His testimony is important as to B. M. Lombard's knowledge of all facts affecting the title he was acquiring, and of the character of payments made by him for the property. Howard says that, if he remembers correctly, the whole matter of title was talked over with B. M. Lombard, and especially the matter of Lewis La Dow's having some equity in the property, or possible equity; that he thinks the character of the equity was discussed; that he (the witness) knew that the object of the guardian's sale was to mortgage the property, and he thinks he talked to Lombard about that, and his recollection is that Lombard said' the record of the property was all right; that he (the witness) had received some back lots, and he talked with Lombard about fixing the matter with complainant by giving him those back lots; that witness and Lombard discussed the matter, and concluded that when complainant became of age he (complainant) would be willing to quitclaim the property if he received those back lots. Howard seems to be as well disposed toward one side as the other. His statements with reference to conversations with Lombard are cautious, but they are explicit enough to make it clear that B. M. Lombard knew all there was to know about the title he was dealing with, and I have no doubt of the truthfulness of the witness. B. M. Lombard is by profession a lawyer, and he is a real estate dealer. He was impressed with the binding character of the record. He relied upon that. But his eyes were open. He saw and heard and knew the facts out of which the record grew. He could not ignore the information he received from Howard in their many conversations on the subject. If B. M. Lombard was relying on the probate record, he was also hoping to extinguish complainant's right or "equity," and to get his deed. What did he want this' deed for? What was Lewis' equity, which had been so fully talked over between Howard and B. M. Lombard? Moreover, consider what Howard says as to what B. M. Lombard paid for this property. The transaction is so involved in the ramifications of a trade that the witness cannot tell whether, as a net result, he got anything or not. He ad-

mits that Lombard paid him $1,000, and that he got something out of 64 outside town lots traded to him by Lombard, and handled and disposed of by the latter. The story of these suburban lots, six miles from Portland and two miles from the Willamette river, and of Lombard's connection with them after the sale, shows the complaisance of Howard, and makes it easy to understand his inability to tell whether he finally, at the end of a trade with Lombard that it would take him a half a day to explain, got anything or not. B. M. Lombard denies the statements of Howard as to conversations respecting Lewis La Dow's rights and equities. Mr. Wade, cashier of the First National Bank at Pendleton, testifies to conversations had with B. M. Lombard and Howard together, in which they said "that a part of the consideration and trade, and the understanding throughout, was that, when this had been settled up, that Lewis La Dow was to get the back lots, but they felt very confident that they were getting the property cheap at that." This witness further testifies that he would not be "real positive," but that he is "morally certain," that Lombard told him "that he was fully acquainted with all the conditions that existed." This testimony is strongly corroborative of Howard's testimony, and it leaves no room to doubt that Lombard knew all about the rights of Lewis La Dow in the premises, and that he relied on his ability to get the latter's deed by the transfer of the back lots; that he had traded to Howard a lot of worthless so-called town lots, and could afford to take chances as to complainant's interests. He felt, as Wade testifies, "very confident that they were getting the property cheap at that." John D. Wilcox corroborates Lombard, but there are portions of his testimony which show that his memory is indistinct in important particulars. He sold out or traded out his interest to Lombard, but so long a time had intervened, and the matter was so involved in "forty trades" that the witness testifies he had had with the latter, that he does not remember whether he got any cash out of it or not.

The petition for rehearing criticises the statement contained in the opinion heretofore rendered that the assumption by Lombard of the illegal mortgage was at complainant's expense. That statement was made upon the theory that Howard intended to account to the complainant for the property held by him, and for which he (Howard) appears not to have paid anything at the time the Lombard deal was entered into. Upon this theory, Lombard's agreement to pay an illegal demand against complainant as a part of the consideration for the property taken—an agreement which he subsequently escaped through an adjudication that the debt was illegal—was at the expense of complainant's interest. If those concerned in the transaction did not intend to restore the fee of this property to the owner, then it must be admitted that, so far as he was concerned, it made no difference whether Lombard paid anything for it or not. And yet the fact remains that this property was conveyed, not sold, in order to effect a mortgage upon it, which the law did not permit; and the party taking the title, with the understanding that he should reconvey it after the mortgage was exe-

cuted, conveyed it to a third person without consideration outside of the mortgage, and manifestly to protect the mortgage. There was no other consideration for these conveyances than the mortgage. So that what Lombard assumed of the mortgage for which complainant was not liable was at the expense of the property and of complainant's interests. There are no disguises that can conceal the fact that when a man takes property upon an agreement to pay, and thereafter avoids payment, he gets to that extent something for nothing, and when he does this it is usually at the expense of the owner of the property so acquired.

The petition for a rehearing is denied.